IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EMMA TODD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 19 C 00392 |
| | ) | |
| JB FOR GOVERNOR, an Illinois not-for-profit corporation, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Emma Todd, a former JB for Governor field organizer during the 2018 Illinois gubernatorial election, alleges that the campaign fired her following the March 2018 Democratic primary election based on her gender identity as a transgender woman, in violation of Title VII. The Campaign has moved for summary judgment. That motion is granted, and the case is dismissed.

## BACKGROUND

Plaintiff Emma Todd joined the JB for Governor political campaign on August 7, 2017, as a field organizer in Springfield, Illinois. Def.'s Rule 56.1 Statement of Facts ¶¶ 2, 5, ECF No. 42.[1] As a field organizer, Todd was involved in the Campaign's voter-outreach strategy; field organizers supported the Campaign by identifying voters who supported Pritzker, ensuring that those voters would turn out on election day, and recruiting and retaining volunteers involved in the Campaign's voter-outreach efforts. *Id.* at ¶ 6. Todd worked for the Campaign through the

---

[1] Todd agrees with the Campaign's statement of facts except where noted. *See* Pl.'s Rule 56.1 Resp. to Def.'s Statement of Facts, ECF No. 50.

primary election held on March 20, 2018; after the primary, she and thirty other employees were laid off. *Id.* at ¶ 29. Todd's last day with the Campaign was March 31, 2018. *Id.* at ¶ 32.

At the height of its operations, the JB for Governor campaign had 34 offices statewide and approximately 200 employees, most of whom were field organizers. *Id.* at ¶ 4. Field organizers reported to Regional Field Directors, who generally supervised several field organizers in a particular geographic region. *Id.* at ¶ 7. During her time with the Campaign, Todd worked for three different Regional Field Directors: Chris Shallow, for a few weeks after Todd started and for a second period from October 2017 through January 2018; Mike Andersen, from August 2017 until October 2017; and Raynal Sands, from February 1, 2018 through Todd's termination. *Id.* at ¶¶ 13-17. Regional Field Directors like Shallow, Andersen, and Sands reported to Deputy Field Directors; Deputy Field Directors generally supervised several Regional Field Directors and oversaw the Campaign's field operations in their assigned regions. *Id.* at ¶ 8. Deputy Field Directors reported to the Campaign's Field Director, Emma Laurent; Laurent, in turn, reported to the Campaign's Primary (and, eventually, General) Election Director, Manfred Mecoy, as did Caitlin Pharo, the Campaign's Field Operations Director. *Id.* at ¶¶ 9-10. Mecoy reported to Quentin Fulks, the Deputy Campaign Manager, and Fulks reported to Anne Caprara, the Campaign Manager. Fulks Decl. ¶ 7, ECF No. 44.

The Campaign alleges that the purpose of the March 2018 layoff was to "allow the Campaign to operate more leanly in the period right after the primary election until later in the spring when the Campaign's general-election efforts would begin again in earnest and to separate employees whose performances had fallen short of the Campaign's expectations." Def.'s Rule 56.1 SOF ¶ 30. In determining which employees would be included in the layoff, the Campaign evaluated the field organizers' quantitative and qualitative work performance for the Campaign

2

through the primary election. Laurent Decl. ¶ 9, ECF No. 47. Emma Laurent, the Campaign Field Director, had the initial responsibility of reviewing the Campaign's data reports and oral and written behavioral reviews from regional field directors, deputy field directors, and other Campaign staff regarding individual employees and making recommendations about which staff should be included in the layoff. Laurent Dep. Tr. 12:8-13:9, ECF No. 51-3; Laurent Decl. ¶¶ 8-9, ECF No. 47. Laurent gave those recommendations to Caitlin Pharo, Manfred Mecoy, and Quentin Fulks. Laurent Dep. Tr. 12:14-16; Laurent Decl. ¶ 15.² Pharo reviewed Laurent's recommendations but gave limited input—she only "confirm[ed] that [she] wanted the Campaign to retain the three employees who [she] directly managed." Pharo Decl. ¶¶ 14-15, ECF No. 46. Mecoy also reviewed Laurent's recommendations and discussed the proposed list with Lauren Brainerd, a senior Campaign advisor. Mecoy Decl. at ¶¶ 25-26. Mecoy then presented the list of recommendations to Fulks, who Mecoy believed to have the final authority to approve the terminations. *Id.* at ¶ 26. Fulks, in conjunction with Anne Caprara, then reviewed and approved the list of employees that would be included in the layoff, including Emma Todd. Fulks Decl. at ¶¶ 22-23; Caprara Decl. ¶¶ 3-4, ECF No. 43.

Todd argues that, quantitatively, she was not only the best-performing organizer in her region, but one of the strongest field organizers in the entire JB for Governor Campaign. *See* Pl.'s Decl. ¶¶ 11-35 (stating that she "had the best metrics in region 15"; that she "consistently met and often exceeded" her performance goals; that she made "7558 volunteer recruitment dials, the

---

² Laurent's testimony, standing alone, is somewhat inconsistent regarding who (and in what order) other Campaign staff received and reviewed her recommendations. In her declaration, Laurent states that she gave her recommendations to Pharo and Mecoy for review. In her deposition testimony, Laurent said that she made recommendations to Mecoy and Fulks. Pharo separately confirmed, however, that she received and reviewed the recommendations from Laurent. Pharo Decl. ¶¶ 14-15, ECF No. 46.

highest in Region 15 and one of the highest in the state"; that she "had the second highest number of Commitment to Votes (CTVs) of all field organizers in the state"; that "on average [she] progressed in performance throughout the Campaign"; and that she "generally received feedback that was very positive on [her] performance"). The Campaign disputes Todd's characterization of her performance. It concedes that, at times, Todd met or exceeded her weekly goals for phone or canvass shifts completed, volunteer recruitment dials, and CTVs collection. *See, e.g.*, Mecoy Second Decl. ¶ 8, ECF No. 58. According to the Campaign, however, Todd was "not a particularly strong field organizer" and was "inconsistent with regard to meeting her goals." Mecoy Second Decl. ¶¶ 7, 10. The Campaign contends that Todd's self-assessment of her relative performance is based on incomplete data, and characterizes Todd's performance overall as "middling" and "mediocre." *Id.* at ¶¶ 5-10.

The parties also dispute whether there were qualitative issues with Todd's performance that warranted her inclusion in the layoff. The parties agree that Todd received some counseling on behavioral issues before Sands became her supervisor—all three of Todd's supervisors at some point counseled her about arriving on time for work, for example, and in the late fall of 2017, Mike Anderson counseled Todd about an inappropriate workplace conversation with a volunteer regarding substance abuse and addiction issues. Def.'s Rule 56.1 SOF ¶¶ 18-19; Pl.'s Resp. to Def.'s SOF ¶¶ 18-19. Todd alleges, however, that the counseling by Shallow and Anderson "related to incidents where she was no more than ten minutes late to work and did not rise to the level of a performance issue" and that the substance abuse conversation with the volunteer was "initiated by the volunteer" and that she "did not discuss the matter further" once Anderson discussed it with her. Pl.'s Rule 56.1 Add'l Facts ¶¶ 36-37, ECF No. 50.

4

But four other incidents cited in connection with the Campaign's decision to include Todd in the March 2018 layoffs are, to some extent, disputed. First, Todd displayed a cartoon poster in her work area that used graphic slang in the speech bubbles and which depicted one person lifting their skirt to reveal a phallic snakehead, which bites the other person's head off. Def.'s Rule 56.1 SOF ¶ 20. Both parties agree that Todd took down the cartoon when Sands asked; they dispute, however, the impetus of Sands' request. *Id.*; Pl.'s Resp. to Def.'s SOF at ¶ 21. Second, Sands and a Campaign volunteer believed (and Todd disputes) that Todd referred to the volunteer as a "bitch" at the Campaign office within earshot of other volunteers. *See, e.g.*, Mecoy Decl. ¶ 9; Stafford Decl. Ex. F. Third, Todd arrived fifteen to thirty minutes late to her assigned staging location at Dry Run 1—an important practice event before the Campaign's get-out-the-vote efforts before the primary—and three volunteers were waiting outside the office when she arrived. *See* Def.'s Rule 56.1 SOF at ¶¶ 23-26; Pl.'s Resp. to Def.'s SOF at ¶¶ 23-26. And fourth, Todd had a disagreement with a different Dry Run 1 volunteer regarding the Campaign's canvassing strategy; senior Campaign officials worried that Todd's allegedly rude interaction with the volunteer would hurt the Campaign's efforts, and Todd was removed from her role as staging location director for Dry Run 2 the following weekend. Mecoy Decl. at ¶¶ 19-23. The Campaign sent a Chicago-based employee to Springfield to assume those responsibilities, and Todd was sent to knock on voters' doors instead. Def.'s Rule 56.1 SOF at ¶¶ 23-28; Pl.'s Resp. to Def.'s SOF at ¶¶ 27-28.

On March 25, 2018, Caitlin Pharo informed Todd that she was included in the Campaign layoffs and that her last day with the Campaign would be March 31, 2018. Def's Rule 56.1 SOF at ¶ 32. Todd alleges that, in a conversation with Sands after her termination, Sands told Todd that Todd "had the best metrics performance in [their] region but 'sometimes it does not come down to job performance.'" Pl.'s Decl. Ex. G, ECF No. 52-7. Todd does not recall any discussions or

5

written communications from or with Sands in which Sands demonstrated anti-trans animus against transgender women. Stafford Decl. Ex. A, Todd Tr. 150:13-151:14. At some point after the layoff, however, Todd learned from a former Campaign volunteer that Sands had made transphobic comments about Todd before her termination, including that Todd was "the annoying kind" of transgender person and that Todd used "her transition to get out of things and . . . cries wolf." Stafford Decl. Ex. E, Crawford Tr. 13:10-12, 14:6-8. Todd expressly does not allege that any other Campaign decisionmaker harbored or ever acted based on anti-trans animus. *Id.* 46:23-47:24.

## DISCUSSION

The Campaign has moved for summary judgment on Todd's Title VII gender discrimination claim. Def.'s Mot. Summ. J., ECF No. 39. Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the record and the inferences drawn from it in the light most favorable to the non-moving party. *Courtney v. Biosound, Inc.*, 42 F.3d 414 (7th Cir. 1994). However, if the nonmovant bears the burden of proof as to a particular element of her claim, she "must affirmatively set forth specific facts that show that there is a genuine issue of material fact." *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 567 (7th Cir. 1989). A "factual dispute is only genuine if a reasonable jury could find for other party," however, and a court need not draw inferences "that are supported by only speculation and conjecture." *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (internal quotations and citations omitted). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"—"complete failure of proof

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).

Todd's sole claim against the Campaign is for Title VII discrimination based on her gender identity.[3] Title VII "prohibits an employer from 'discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 957-58 (7th Cir. 2021) (citing 42 U.S.C. § 2000e-2(a)(1)). A plaintiff may establish an employer's discriminatory intent directly or through "circumstantial evidence that provides the basis for an inference of intentional discrimination." *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013). "When a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Igaski*, 988 F.3d at 958 (citing *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). Where a plaintiff "does not allege [discriminatory] motives by [the decisionmakers] who recommended her termination," the plaintiff may rely on a "cat's paw theory of liability" to satisfy causation; the theory applies "when a biased supervisor who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021).

---

[3] In *Bostock v. Clayton County*, --- U.S. ----, 140 S. Ct. 1731 (2020), the Supreme Court held that Title VII's provisions prohibit discrimination on the basis of gender identity. *See, e.g.*, 140 S. Ct. at 1747 ("[D]iscrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second.").  !

Todd invokes the cat's paw theory here: she argues that the six decisionmakers involved in the Campaign's post-primary layoffs based their recommendation to include Todd in those layoffs, at least in part, on bias-tinged negative information about Todd's performance from Todd's direct supervisor, Raynal Sands. The cat's paw theory requires a plaintiff to "present evidence that 'the biased subordinate actually harbored discriminatory animus' against her and that the subordinate's scheme proximately caused the adverse employment action." *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (citing *Robinson v. Perales,* 894 F.3d 818, 832 (7th Cir. 2018)). Based on Sands' email to Rachel Cowell requesting Todd's termination after the primaries, Stafford Decl. Ex. H; Alexander Crawford's testimony that Sands made comments to him and other staff that Todd is the "annoying kind" of transgender person, *id.* Ex. E, Crawford Tr. 13:1-15; emails to senior Campaign staff regarding Todd's behavioral incidents that originated from Sands, *id.* Ex. F-G, Pl.'s Decl. Ex. H, ECF No. 52-9.; and statements by several Campaign officials that information about field organizers' performance trickled up through the chain of command, *see, e.g.*, Stafford Decl. Ex. C, Laurent Tr. 14:9-16:4, Pl.'s Rule 56.1 Ex. 2, ECF No. 51-2, Todd urges that "Ms. Sands made negative reports about Ms. Todd based on Ms. Sands' discriminatory animus towards Ms. Todd as a transgender woman, sought to get her terminated by means of these negative reports, and accomplished that objective by passing these negative reports to supervisors who relied on them to terminate Ms. Todd." Pl.'s Resp. Opp'n at 9. She argues that whether the Campaign's decisionmakers had a genuine belief that Todd should be discharged based on the identified performance deficiencies is irrelevant to the question of liability, emphasizing the Supreme Court's instruction that even where an employer chooses to conduct an independent investigation into a supervisor's allegations, the "supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining

8

that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub v. Proctor Hosp.*, 562 U.S. 411, 420-21 (2011); Pl.'s Resp. Opp'n at 2-3.

Todd's cat's paw theory fails for two reasons. First, Todd has not presented evidence from which a reasonable jury could conclude that Sands' behavioral reports about Todd were motivated or inappropriately colored by discriminatory animus. The Court assumes, for the purposes of summary judgment, that Sands did make transphobic comments about Todd to Campaign staff and volunteers.[4] But that Sands harbored anti-trans bias against Todd does not necessarily mean that Sands' decisions to flag behavioral concerns to her supervisors were discriminatory. *See Staub*, 562 U.S. at 422 (noting requirement that a "supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action") (emphasis in original); Pl.'s Resp. Opp'n at 3 (acknowledging that Sands' reports must have been "motivated by discrimination" for the Campaign to be liable). Even where a supervisor's bias is clear, the plaintiff still bears the burden of demonstrating that the supervisor's challenged negative employment action was motivated by that bias, rather than by legitimate performance concerns. *See, e.g.*, *McPhaul v. Bd. of Com'rs of Madison Cty.*, 226 F.3d 558, 565 (7th Cir. 2000), *overruled on other grounds*, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013) ("And because [the plaintiff] presents no evidence to indicate that [the biased supervisor]'s transfer and termination decisions were motivated by any reason other than [the plaintiff]'s performance deficiencies (which are undisputed), she clearly fails to show that [the supervisor]'s decisions were motivated by racial animus."); *Gray v. Zaruba*, No. 16 C 4850, 2019 WL 5536839, at *8 (N.D. Ill. Oct. 25,

---

[4] The Campaign "does not concede Ms. Sands did" make the comments Crawford alleges, but argues that even if she did, Todd's claim nonetheless cannot survive summary judgment. Def.'s Memo. Supp. at 13 & n.6. At this stage in the proceedings, then, Crawford's testimony regarding Sands' comments stands undisputed.

2019) (explaining that "[t]o prevail on [a] Title VII claim using a cat's paw theory," the plaintiff's evidence must establish that the allegedly biased supervisor "performed a specific act due to animus"; that the supervisor intended that act to cause an adverse employment action; and that the act was the proximate cause of the adverse employment action).

No evidence in the record suggests that Sands mischaracterized, hyperbolized, or otherwise overstated Todd's behavioral issues due to her alleged bias. The parties agree on the basic facts underpinning most, if not all, of the behavioral issues the Campaign cites: that the cartoon displayed in Todd's work area "display[ed] violence" and included the terms "cock" and "pussy," Stafford Ex. A, Todd Tr. 102:12-103:6; that a volunteer and Sands believed that Todd had called the volunteer a "bitch," Todd Tr. 109:9-18; that Todd arrived fifteen to thirty minutes to the Dry Run 1 staging location—on the day of an important practice run for the Campaign's Get Out the Vote weekend—while three people waited outside for the location to open, Todd Tr. 119:3-120:11; and that Todd's (allegedly contentious) disagreement with another Dry Run 1 volunteer led to Todd's removal as the Springfield staging location director for Dry Run 2, Pl.'s Rule 56.1 Resp. Def.'s SOMF ¶¶ 27-28. Where Sands relayed these behavioral issues through email, those emails provided a relatively straightforward recounting of the incident at issue. *See* Stafford Ex. F (explaining that she wanted to flag Todd calling a volunteer a "bitch" because the volunteer was offended and it was within earshot of other volunteers, but noting that she thought Todd used the word "in a playful manner"); Stafford Ex. G (explaining the request for Todd to remove the cartoon posted was based on the poster's depiction of violence and use of "strong inappropriate language"). And there is nothing in the summary judgment record suggesting that Sands made more inflammatory complaints about Todd orally. Todd points only to Laurent's testimony that she was in communication with Sands via text, phone call, and email as establishing that Sands had direct

contact with senior Campaign staff, but she offers no evidence suggesting that Sands mischaracterized any particular incident or exaggerated her concerns about Todd's performance through those channels.

Todd alternatively argues that even if Sands' reports themselves were not "discriminatory in nature or tone," Sands' decision to report the incidents was unreasonable and "motivated by discrimination." Pl.'s Resp. Opp'n at 3. A volunteer in the Springfield office testified in his deposition that Sands and Todd "definitely didn't like each other" and that there was a "constant back and forth" between the two; he observed that his partner, another Campaign employee, "never got anything done on time either and she didn't get yelled at quite as much" as Todd did. Pl.'s Rule 56.1 Ex. 4, Crawford Tr. 10:14-21, 15:10-16:11. But Todd does not present any evidence that she was reprimanded or counseled for behavioral issues that went unaddressed with other Campaign employees, or that Sands made negative reports about Todd regarding conduct that she excused for others. Instead, Todd disputes the reasonableness of Sands' response to the incidents at issue. Todd contends, for example, that she was "accused by Ms. Sands of being late for a practice event referred to as Dry Run 1"—ignoring, it seems, Todd's own deposition testimony that she told Sands about her late arrival and the people waiting for her outside of the office when she showed up—and tries to explain why her late arrival was not actually a big deal, insisting that it was "patent[ly] unreasonable[]" for Sands to "criticiz[e] [her] for arriving at the office at 8:45 am due to job duties that took Ms. Todd elsewhere,[5] when the office was not due to open for public admission until 10:00 a.m." and that Sands was trying "to find fault so that she could terminate her." *Id.* at 11.

---

[5] Picking up donuts. Pl.'s Decl. Ex. A, Todd Tr. 118:10-14.

11

The evidence in the record indicates that in each of the behavioral incidents, Sands' action was instigated either by a volunteer's complaints or by Todd's own self-reporting of an issue; moreover, in at least two of the incidents, Sands's counseling or reprimand concerned behavioral deficiencies that had also been observed and addressed by Todd's previous supervisors, not just Sands. Several witnesses stated in their declarations or in deposition testimony that Sands' direction to Todd to remove the poster hanging in her workspace, for example, was prompted by a volunteer's complaint about the artwork. *See* Pl.'s Rule 56.1 Resp. Crawford Tr. 41:5-11 ("I know that a volunteer had complained about Emma had some kind of artwork in her office having to do with trans people. . . . [S]omebody complained about it and Ray asked Emma to take it down."); Stafford Ex. G (Sands explaining to Todd that "[i]t was brought to [her] attention" that Todd had the poster hanging in her office); Budzinski Decl. at ¶ 5 ("I recall a volunteer informing me that Ms. Todd had displayed a poster of a cartoon in her workspace that the volunteer found inappropriate because the cartoon used graphic language and depicted violence."). Todd contests that she called a Campaign volunteer a "bitch," but whether she did or not, both Sands and the volunteer thought she did, and the volunteer took offense. *See, e.g.*, Pl.'s Decl. Ex. E (Todd: "For real though, I didn't call you the b word yesterday" . . . Volunteer: "You did/But let's move forward"). And the evidence suggests that the characterization of Todd's attitude toward a different Dry Run volunteer as "rude" came from volunteers themselves, not from Sands. *See* Budzinski Decl. at ¶¶ 9-11 (Budzinski states she learned of the incident from other Campaign volunteers and the volunteer's husband, and that Budzinski "understood that Ms. Todd disagreed with the volunteer . . . and in addressing that issue, had been extremely rude to the volunteer to the point of the volunteer leaving the Springfield staging location"). Finally, Todd had been counseled for behavioral issues prior to Sands' employment with the Campaign. Todd concedes that both of her

previous supervisors had counseled her about arriving for work on time when she was "no more than ten minutes late to work"—so that Sands told her it was "unacceptable" to be fifteen to thirty minutes late to one of the Campaign's most important pre-primary events while members of the public waited outside the staging location does not support an inference that Sands' reprimand was driven by animus. *See* Stafford Ex. A. Todd Tr. 76:1-24 (Todd agreeing that all three of Todd's supervisors had "communicated to [her] concerns about [her] failure to arrive to work on time"). Nor was Sands' reprimand for Todd's language toward a volunteer the first time Todd had been counseled about appropriate boundaries with Campaign volunteers. *Id.* at 80:2-15, 84:6-18.

In sum, the evidence she presents shows only that Todd disagrees with Sands' and other Campaign staff's assessment of the import of several behavioral incidents, not that Sands had a discriminatory motive in reporting them or mischaracterized, overstated, or otherwise distorted those incidents based on bias. *Compare Hill*, 724 F.3d at 968. So, even if Sands did make the alleged transphobic remarks that Todd alleges, Todd has not borne her burden of producing evidence that Sands made the negative behavioral reports at issue because of her anti-trans bias.

Todd's cat-paw theory also fails on proximate causation. Even if Sands did provide bias-tinged negative information to Deputy Field Director Rachel Cowell about Todd's performance—information which was, in turn, reported further up the chain of command—the evidence in the record does not support the conclusion that Sands' reports were the proximate cause of Todd's inclusion in the Campaign's post-primary layoffs. *Staub* warned courts that if a biased supervisor—acting as the employer's agent—"committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision," the "mere conduct of an independent investigation" does not necessarily relieve the employer of "fault." *Staub*, 562 U.S. at 420-21. Post-*Staub*, however, the Seventh Circuit has emphasized that

13

"the mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Id.* at 462. The employee must still demonstrate that the biased supervisor's reports were the proximate cause of the adverse employment action; if the employer's decision "did not rely on the credibility of the biased supervisor . . . the employee's cat paw theory will fail." *Id.* An employer's belief that it had "independently sufficient reasons, such as corroboration of the allegations" to fire, demote, or take another adverse employment action against an employee is enough to break the causal chain between a biased supervisor's reports of wrongdoing and the employer's adverse action. *Id.*; *see also Woods*, 803 F.3d at 870 ("If the ultimate decision-maker does determine whether the adverse action is entirely justified apart from the supervisor's recommendation, then the subordinate's purported bias might not subject the employer to liability.").

Todd does have evidence that Sands provided negative behavioral reports about Todd to her supervisors. Sands copied her Deputy Field Director, Rachel Cowell, on the email to Todd directing her to remove the cartoon from her workspace, for example, and Cowell forwarded that information to Caitlin Pharo. See Pl.'s Decl Ex. I, ECF No. 52-9. Sands also emailed Cowell directly to report that Todd had just "called [a volunteer] a 'bitch' though in a playful manner" in earshot of other volunteers and that the volunteer was offended. Stafford Exs. F-G. More generally, senior Campaign staff testified that "[b]ecause of the supervisory structure" of the Campaign—in which information about field organizers' performance flowed upward from Regional Field Directors to Deputy Field Directors and eventually to senior members of leadership—decisionmakers including Laurent, Pharo, and Mecoy were aware "that there had been issues with Ms. Todd's performance during her employment." *See, e.g.*, Laurent Decl. at ¶ 6. Finally, it is undisputed that Sands emailed Cowell requesting Todd and another subordinate's termination after

14

the primary elections; in the email, Sands complained that Todd and another field organizer are "beyond difficult to work with and do not take directions." Stafford Ex. H.

But Todd's claim cannot survive summary judgment because the Campaign's independent knowledge and corroboration of Todd's behavioral issues breaks the proximate causation chain between Sands' alleged bias and Todd's termination. There is no evidence in the record that Sands' email requesting Todd's termination was seen by any Campaign employee besides Cowell. In fact, the Campaign presented evidence that not only were senior Campaign decisionmakers unaware that Sands had requested Todd be dismissed after the primary election, but that the decisionmakers did not seek out any information from Deputy or Regional Field Directors while they were determining which field organizers would be included in the layoffs; that Campaign officials had serious concerns about Todd's judgment based on several incidents, but particularly her negative interaction with the volunteer during Dry Run 1 that led to Todd's being replaced as the Springfield office's supervisor of Dry Run 2; and, crucially, that senior Campaign staff had received information about Todd's problematic interactions with volunteers from people other than Raynal Sands.

The Campaign's evidence that senior decisionmakers received information about Todd's performance before and during Dry Run 1 from individuals other than Sands is undisputed. So, regardless of what Sands reported up the chain of command regarding Todd's performance, senior staff did not need to rely on Sands' credibility to get a full picture of the events in question. Nikki Budzinski, a senior Campaign advisor who did not know Raynal Sands, submitted a declaration stating that she "periodically spoke with [volunteers in the Springfield area] about how they thought things were going in that office" and that she "periodically heard from them about issues with Emma Todd." Budzinski Decl. ¶ 4, ECF No. 59. Those issues included Todd's display of the

15

workplace-inappropriate cartoon, that "Ms. Todd would regularly show up late to the office and was often difficult in her interactions with volunteers," and Todd's disagreement with a volunteer during Dry Run 1 over canvass strategy. *Id.* at ¶¶ 5-9. Budzinski characterized the numerous complaints she received about Todd from Campaign volunteers as atypical and stated that she "reached out to Mr. Mecoy about Ms. Todd more than once . . . because [she] was concerned that volunteers' interactions" with Todd would damage the Campaign. *Id.* at ¶ 13.

Regarding the Dry Run 1 incident, Budzinski learned from Springfield-based Campaign volunteers, and directly from the husband of the volunteer at issue, that Todd was "extremely rude to the volunteer to the point of the volunteer leaving the Springfield staging location"; Budzinski was "very concerned" about Todd's handling of the situation and was worried it would reflect negatively on the Campaign, especially as the volunteer's husband "was himself a key political stakeholder in the community." *Id.* at ¶¶ 10-11. Finally, Budzinski confirmed that she informed Mecoy directly about the Dry Run 1 incident. *Id.* at ¶ 12. Mecoy stated that, because of Todd's interaction with the volunteer, the Campaign "had to work to repair the relationship with the volunteer, who was an important political stakeholder in the Springfield community" and that senior Campaign staff were "concerned about losing the support of the volunteer to whom Ms. Todd had been rude, as well as other volunteers who witnesses the events at the Springfield staging location during Dry Run 1." Mecoy Decl. at ¶ 22. And, as a result of the incident, the Field Department's leadership "decided to remove Ms. Todd from her role as staging director at the Springfield location"; Mecoy states he was "worried about Ms. Todd continuing to directly interact with volunteers"—a serious concern, as "the relationship between field organizers and volunteers is extremely important"—and that switching her role to canvassing was a "significant reduction in Ms. Todd's responsibilities." *Id.* at ¶¶ 10, 23.

In sum, the evidence in the record establishes that the Campaign determined that it would need fewer field staff in the aftermath of March 2018 primary election until later in the spring before the general election. Laurent made recommendations regarding which employees to include in that layoff on based on employees' quantitative and qualitative performance, without specific input from Regional or Deputy Field Directors but with knowledge of earlier behavioral issues that had been reported up the supervising chain. Senior Campaign staff either did not recall specific information about Sands' earlier assessments of Todd's performance, *see* Laurent Decl. at ¶ 13, Mecoy Decl. at ¶ 28, Fulks Decl. at ¶ 26, or viewed earlier behavioral reports that may have originated with Sands as "concerning and inconsistent with the Campaign's expectations," but confirmed that they "did not lead to Ms. Todd's immediate termination." Fulks Decl. at ¶ 18. Laurent and Mecoy both stated that Todd's disagreement with the Dry Run 1 volunteer, however— a concerning incident that Mecoy learned about from Budzinski, who spoke to volunteers that witnessed the incident directly—occurred shortly before the post-primary layoff and was top of mind as recommendations were being made. *See* Laurent Decl. at ¶¶ 10-12; Mecoy Decl. at ¶ 24 (explaining that at the time he reviewed the recommendations, "this incident" with Todd "was on my mind"). As a result, Laurent's recommendation that Todd be included in the layoffs, with thirty other Campaign employees, was signed off on by as many as five other Campaign decisionmakers, none of whom Todd alleges harbored or acted based on anti-transgender bias.

Based on the evidence before the Court, a reasonable jury could conclude neither that Sands' behavioral reports were discriminatory in motive or content nor that Sands' transphobic bias was the proximate cause of the Campaign's decision to include Todd in the post-primary layoffs. Even drawing all reasonable inferences in her favor, Todd has not met her burden of demonstrating that Sands "use[d] the formal decision maker[s] as a dupe in a deliberate scheme to

17

trigger a discriminatory employment action." *Vesey*, 999 F.3d at 461. The Campaign's motion for summary judgment on Todd's Title VII discrimination claim is granted, and this case is dismissed.

Dated: August 17, 2021

_____
John J. Tharp, Jr.
United States District Judge

18